We'll move on to argument in our second case, Caceros v. Garland, case number 20-73024. And we'll first hear from Petitioner's Counsel, Mr. Morrison. You may proceed. Good morning, Your Honors. Aaron Morrison on behalf of Ms. Caceros. I'd like to reserve approximately five minutes for rebuttal time in this case. Your Honors, this case involves an appeal of a denial of an agency decision denying Petitioner's request for protection under the Convention Against Torture. The primary issue that I would like to focus on and what we covered mainly in our briefing in this issue is whether the agency's determination regarding the likelihood of future harm in this case was supported by substantial evidence, where the agency, that is the immigration judge and the BIA, reached conclusions and indeed rejected the testimony of Petitioner's expert witness in this case without explaining or providing reasons for doing so. Now it's well established under decisions from this court and also more recently decisions from the Board of Immigration Appeal that the BIA or an immigration judge cannot reject the testimony of an expert without explaining why it's doing so. Specifically, what's your basis for saying that the agency didn't give reasons? It explained why it didn't find the expert's statements persuasive as to the specific Petitioner. What more do you think they needed to say? Well, Your Honor, in this case, the expert submitted a 15-page declaration, which was heavily documented with 40 footnotes. The expert testified with great detail regarding the likelihood of harm that Petitioner faces if being removed to Guatemala in light of her sexual orientation, in light of the fact that she's heavily tattooed, including tattoos on her forehead, other visible parts of her body. The expert went on at length that ... But can you point me to where the expert pointed to actual evidence, examples of where individuals in Petitioner's situation were subject to torture? Because it seemed like, at least what the IJ said, was that this was speculative, conclusory, not much different than the country conditions report. And did the Petitioner or did Dr. Wei ever ... Can you point me to anything where Dr. Wei said, here's some example why this Petitioner is going to face this specific harm, as opposed to just generically, hey, tattooed individuals may have an increased likelihood of being involved in violence or subject to violence? Yes, Your Honor. He said that during his own background research, having lived in Guatemala, tattoos are inextricably, quote, inextricably associated with gang membership in Guatemala, that it's even more rare for a female to have tattoos in Guatemala. But that doesn't mean ... That may be true that there's a correlation between tattooed individuals and gang membership, but that doesn't mean that all tattooed individuals are therefore members of gangs, or even assumed to be. So I think ... I mean, at least that's what the IJ found. At least that's how I read it, by when the IJ said this was sort of speculative. And so I think the concern here is that if we disregard the IJ's findings here, we'd run the risk of opening the door for a whole bunch of very generic statements in subsequent cases that aren't tied to the specific Petitioner in the case. Well, Your Honor, I think I would respectfully disagree, though I understand your concern. I think this case is very unique. We're not dealing with an applicant who is just merely marked by tattoos. It's a combination of circumstances that, yes, includes the tattoos. It includes her sexual orientation. It includes her gender. And when you have this constellation of factors, that does in fact constitute a particularized risk of harm in this case. And with respect, the IJ did not necessarily make any finding whatsoever regarding the expert's testimony as to whether or not his testimony as a whole was speculative. She focused on one aspect of his testimony, which was that he opined that there was a chance she could likely be subject to forcible sex trafficking or being forced to work in the sex industry. The IJ found that, the BIA affirmed that aspect of the IJ's opinion, but she didn't engage the rest of his testimony, either written or testimonial, as to the other types of harm that Petitioner faced. And so, counsel, I'd like to follow up on Judge Nelson's question, too. So the IJ clearly engaged with Dr. Way. He provided an extensive affidavit and then testified and was cross-examined at length. It would have been very difficult. It would have been negligent for the district court or the IJ to have ignored it, and she did not. So let me give you the three characteristics that you pointed out from Dr. Way's testimony that were important. One was that she's tattooed and that tattoos, you said, are inextricably associated with gangs. Two, it's unusual for a woman in Guatemala to be tattooed. And three is the fact of her sexual orientation. So the three, those three characteristics, is there any evidence in the record that people with those three characteristics are likely to be tortured in Guatemala? I would point to, in your honor, if I may also add one other characteristic as well. She does suffer from mental illness as far as post-traumatic stress disorder and also lupus. And Dr. Way did testify that LGBT individuals face discrimination in medical treatment because of their orientation. Right, but you're going to have to get from facing discrimination in medical treatment to the whole question of torture, and that's going to be quite a leap. So let's focus on those three things, which were really the crux of what Dr. Way testified to. So, again, my question was, is there any evidence in the record that a person, that a woman who is a lesbian who is tattooed in Guatemala is going to be tortured, is likely to be tortured? So I would point, first of all, to the 2018 Department of State report at AR 1033, which indicates that crimes involving violence targeting lesbian, gay, bisexual, and transgender individuals was a serious problem. The report also states at 1049... Yeah, no, at 1033, the one that you've done the most that the report says is that there's violence or threats thereof. It doesn't say anything about torture there. Well, it doesn't use the word torture, but... Right, but does a threat of violence arise to the level of torture? That is certainly the kind of thing that we would be considering if we were looking at the asylum or withholding claim, because that would go to the question of persecution, but that's very different. Right. This would be a very different case, counsel, if your client were here on an asylum or withholding. Right, I understand. But with all due respect, Your Honor, it still tends to support, in my opinion, the expert's testimony. Violence, certainly, I understand not all violence necessarily is torture, but it still, in my view, tends to support his testimony. And I would also point out to this court's fairly recent decision in Castillo v. Barr, which we cited to in our reply brief at 980 F. 3rd 1278, the fact that there's not specific documentation in the record that specifically supports an expert's testimony, that is not a basis to reject the expert's testimony. And the court, I think, was very right to point out that it would be duplicative and repetitive if you had an expert who was just merely going to read what was already in the record. And I think that's why petitioner, that's why we had an expert testify, to synthesize and tie together what was a pretty voluminous record as far as country conditions are concerned. Counsel, can I ask you about the other aspect? Because when Dr. Way basically talked about what the worst case scenario was, how does it tie into, at the hands of or with the acquiescence of the government when the immigration judge and the BIA talked about laws that have been passed, a woman elect, a lesbian woman elected to government, different organizations that now exist within the country to support people of different sexual orientation, particularly women. I mean, he said a lot of bad things could happen to her, but it didn't seem to me to quite get to at the hands of or with the acquisition or acquiescence of the government. Yes, thank you. So as to the harm that Dr. Way testified that petitioner could face, the sources of harm did include state actors. He opined that she faced particular harm as a result of her orientation on the part of police. Also. These neighborhood vigilante organizations who are engaged in the lynching of LGBT individuals who operate as a de facto arm of the state and also along with potential harm from private actors. But our position is that that would satisfy the state action requirement as far as CAT is concerned. If you have the police engaging in abuse of similarly situated individuals, and I believe the we did submit evidence that indicates that LGBT individuals in Guatemala do face harm on the part of the police as well. So. So I think that his testimony was pretty clear that she does face harm from state actors in Guatemala, along with private actors. Would you like to reserve time for rebuttal? Yes, thank you. Thank you, Counsel. We'll now hear from the government. Good morning, Your Honors. May it please the court. My name is Aung Park for the Attorney General. In this petition for review, the petitioner raises two primary challenges to the agency's decision. The first, whether the agency properly considered the relevant evidence in denying her application for deferral of CAT protection. And two, whether the record contains sufficient evidence that clearly establishes her removability as an individual convicted of an aggravated felony crime. So does the government contend that the IJ or the BIA erred here? No, Your Honor. With respect to the first or this? No, any of it. The reason why I'm asking is a week ago, or less than a week ago, the government came in jointly and asked for this to be referred to mediation. And I'm trying to ferret out what the government's position on that was. I understand that result was a result of recent guidance that was issued. But if there's no basis for the IJ or the BIA to have gotten this wrong, what is there to mediate? Why don't you just defend this all the way through? That guidance that was the impetus for the motion that was filed fairly recently before this court was issued, I believe on April 4th. And it provided some additional language and further clarification with respect to those circumstances in which the exercise of prosecutorial discretion by ICE offices may be appropriate. But it still suggested that one of the considerations is whether the individual faces harm to the public. She was just four years ago convicted of assault with a deadly weapon and attempted home invasion or robbery. Is the government's position that that is someone who is not a public threat? Not at all, Your Honor. The motion filed before the court requested an opportunity for the appropriate field offices to consider or to explore the possibility of prosecutorial discretion under the most recent April 4th guideline that had been provided. And under that April 4th guideline, some of the language includes recognition that criminal history alone should not necessarily be a determinative factor that precludes exercise of prosecutorial discretion. So the government's position is that an immigrant who may be here or has been found to be removable and has been convicted of assault with a deadly weapon and attempted home invasion or robbery may not be removable under prosecutorial discretion because they don't face a sufficient risk to the public? No, Your Honor. I think the government's position is that under the new guidance, there may be an opportunity that could be provided for the Department of Homeland Security or the appropriate ICE office to consider whether given the totality of the circumstances of her particular case and her personal experiences, whether that would be a possible opportunity for her. Could you give me an example of what exactly the personal circumstances would have to be to suggest that someone who is convicted of assault with a deadly weapon would not be a risk of harm to the public? Well, I think specific to this particular case, and again, the policy memo was very clear that any sort of prosecutorial discretion, opportunity or consideration should be under the circumstances specific to that particular individual. So in this case, there is evidence in the record indicating that Petitioner has been subjected to some pretty severe and multiple domestic violence relationships. She was also subject to some sexual abuse when she was a minor at the hands of her stepfather. There is indication in the record that she has been diagnosed with some mental health issues, including, I believe, depression and anxiety at some point. So the government's position is that if an immigrant is convicted of assault with a deadly weapon, I keep repeating that because we're talking about assault with a deadly weapon. And so I'm trying to figure out if that individual has depression or anxiety, that they then don't pose a sufficient risk to the public such that they should be allowed to ignore the laws. I think that it isn't the government's position to your honors at this point that this particular petitioner is no longer a threat to public safety. The only opportunity that we had requested through that motion that was recently filed was only to provide the opportunity for the appropriate ICE field office to consider. And when does that guidance go into effect? I believe April 25th, your honor. Okay. So there's a good likelihood we'll resolve this case before April 25th. That should resolve the government's concern then, right? Because the guidance wouldn't even be in effect if we resolve the case before it goes into effect. That's correct, your honor. Okay. Well, I just, I'm sorry to take the time with you, but, you know, you talk about limited resources for the government. We're a court with limited resources, too. And when we come in and we have three judges who've spent a lot of time on a case, and then we get a request one week before on, with all due respect, a pretty flimsy basis in this particular case, it's not exactly being respectful of the court's time in that case. And my apologies for any inconvenience that caused the court. We do recognize on behalf of the government that it was a very late filed motion and request put before the court. We felt that because the April 4th policy had just come out that, with additional language and some further clarification that provided additional guidance with respect to prosecutorial discretion, that we should, based on the issuance date of that memo, at least put that consideration before the court. Counsel, what would prevent the government from an exercise of discretion, even if the court were to proceed here? So if we were to proceed to a final judgment on the matter that's currently before the court, doesn't the government still have some discretion in how they enforce those? Yes. That's absolutely correct, Your Honor. Okay. So if that's the case, there's really no reason why this court shouldn't go forward and make its decision. It wouldn't interfere with your guidance. That is correct, Your Honor. Technically, it would be a different procedure for the field office to consider whether prosecutorial discretion is something they would like to exercise, even after an issuance of a decision in this matter. Counsel, let me put the question to you that I put to Mr. Morrison. So there are some evidence in both Dr. Way's testimony, his extensive testimony, and also in the State Department reports that women are subject to the machismo of culture of Central America, that tattoos are largely used by gang members and not very often by women, and that sexual orientation is a basis for a discrimination violence, including at the hands of the police. So I just looked at the State Department report, and the State Department report actually acknowledges that point. So there's three points. What's unusual here is that we have all three together in combination. And I didn't see anything in the State Department report that sort of referred to those things in combination. Dr. Way has addressed that in part. Is there anything in the record that would suggest that a person in Ms. Cacero's situation would not be subject to some kind of persecution in Guatemala, whether it arises to the level of torture? I think it's a different question. I think and I believe the immigration judge's decision did acknowledge this point, that the record does have some evidence of some mistreatment that would be experienced by persons who fall into these categories that you just identified, Your Honor. I think that immigration judge was very careful to take a look at the record and say, I see that there are certainly mistreatments and difficult circumstances that are created for persons in Guatemala who may be members of the LGBTQ community, who may have visible tattoos, and who, frankly, just happen to be women, that there are high rates of violence against women. But I think the immigration judge in this case did exactly what the role of the judge is, which is to take all of the evidence, both in favor of Ms. Cacero's position, as well as those countervailing that evidence, weighted, as is the role of the immigration judge, and determined ultimately that the weight, the burden of proof was not met by Ms. Cacero's to demonstrate that she would be targeted for torture should she return to Guatemala. And I think on that point, the substantial evidence review is absolutely the correct standard to apply here. And under that review requires that no reasonable fact finder would be able to find differently from how the agency concluded in this matter. And as the board and the immigration judge properly laid out all of their grounds for the reasons that they held that, for how they, why they held that they did, we do not believe that, we believe fully that substantial evidence supports the agency's position. What more would petitioner need to provide? Is it required that a petitioner would have to suggest or present evidence that she'd faced actual violence before? Or, I mean, if she's not in the country, how would she be able to present evidence that she would face persecution when she returns? Well, in this case, it would be beyond persecution. It would be torture, which is a higher level of mistreatment or harm. And in this case, specific to this case, if there were some conclusive, if there were some additional evidence with respect to the high likelihood that she would be targeted and subjected to extreme mistreatment or harm, that would raise the level of torture. However that specific evidence or additional evidence might look, I think what was missing here, and the immigration judge pointed that out, was that there was not that showing. And in addition to sort of the absence of some of the evidence that would have demonstrated the rising to the level of torture, there was also some question with respect to Dr. Way's testimony and evidence that he provided, including that some of the country conditions evidence report in the record was not specific to Guatemala, which is where Ms. Caseros would be returning to, but that it sort of encompassed the broader Northern Triangle Latin American areas, including Honduras and El Salvador, which obviously would have different impact and would not be relevant to Ms. Caseros' case. So I think it wasn't just a matter of there not being sufficient evidence proffered. There also seemed to be some concerns that the immigration judge expressed in terms of the evidence that was in the record. Unless there are any additional questions from the bench. For the reasons that we have articulated in the brief, the agency properly denied the application for the deferral of removal request here and we would respectfully ask that the petition review be denied, Your Honors. Thank you, counsel. Thank you for your arguments and thank you for your presence here today. We'll give rebuttal time now. You're on mute, counsel. Apologize. Thank you, Your Honor. I just briefly also want to apologize. I don't want my friend on the other side to take all the blame for that motion that was filed last week. Although I understand. You don't need to apologize. It's in your client's interest. Well, I certainly didn't see it as a flimsy basis. I just want to say that my client suffers from post-traumatic stress disorder, depression and anxiety. She had a horrific childhood. I'm not excusing her criminal misconduct, but on top of that, domestic violence. And she actually has a U visa now pending and she's doing very well now since she's been released. With a U visa pending, would that have to be issued if we were to issue a decision against your client in this case before the government enforced that? Would the U visa have to be issued or can the U visa issue even after it was enforced she was returned to Guatemala? I believe she could theoretically return if the U visa was approved at some point later in the future. However, U visas are taking about five years right now for adjudication. So that would still result in serious hardship for her if she was removed. But nevertheless, we have filed for that relief. I wanted to also mention just in response, well, I guess my time's up. We'll give you, we'll take some time if you have some. Thank you. I appreciate it. There was a discussion, the IJ mentioned it and also council mentioned the fact that there was a lot of evidence or at least some evidence in the record that pertained not just to Guatemala, but also to Central America in general. And I recognize that we did develop a rather voluminous record, some of which pertain to Central America in general. But again, that was why petitioner retained an expert to testify more specifically with respect to Guatemala. And I will I have to mention again, although the IJ focused on one aspect of his testimony specifically, the fact that she might be forced into the sex trade industry as unsupported and speculative. She did not address the rest of his affidavit or his testimony, which mentioned harm that we believe does rise to the level of torture on the part of state actors. And that was not addressed. She she may have recounted the testimony, but she did not explain why she was reaching a different conclusion than that of the expert. And for that reason, at a minimum, I think this court has to remand the case back to the agency to properly evaluate his testimony. And if there's no other questions, your honor, your honors, I'm I'll conclude. Thank you. Thank you, counsel, for both of your arguments in the case today. The case is now submitted.
judges: BYBEE, NELSON, Bolton